**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND ORRAND, et al,** | : | |
| | : | **Case No. 2:08-CV-1046** |
| **Plaintiffs,** | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge King** |
| **KEIM CONCRETE PUMPING, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**OPINION AND ORDER**</u>

### I. INTRODUCTION

This matter is before the Court on Plaintiffs, Raymond Orrand and the Trustees of the
Ohio Operating Engineers Health and Welfare Plan, Ohio Operating Engineers Pension Fund,
Ohio Operating Engineers Apprenticeship Fund, and Ohio Operating Engineers Safety and
Education Fund's (collectively "Funds"), Motion for Summary Judgment (Doc. 39); Intervenor,
International Union of Operating Engineers, Local 18's ("Union") Motion for Summary
Judgment (Doc. 32); Defendant, Keim Concrete Pumping, Inc.'s ("Keim Concrete") Motion for
Summary Judgment (Doc. 35); and the Funds' Motion to Strike (Doc. 43).  For the reasons set
forth below, the Funds' Motion for Summary Judgment is **DENIED**; the Union's Motion for
Summary Judgment is **GRANTED in part**; Keim Concrete's Motion for Summary Judgment is
**DENIED**; and the Funds' Motion to Strike is **GRANTED**.

### II. BACKGROUND

#### A. Factual

The Funds are jointly-administered fringe benefit programs in place for the benefit of
employees and contractors who perform work pursuant to a collective bargaining agreement
("CBA") with the Union.  The Union is a labor organization as the term is defined under 29

U.S.C. § 152(5).   Keim Concrete is an Ohio corporation that meets the definition of an employer

affecting interstate commerce as the term is defined under 29 U.S.C. §§ 151, 1003.  Keim

Concrete is a construction company specializing in pumping large quantities of liquid concrete to

certain work areas in and around construction sites and is owned and operated by Larry Keim

("Keim").  This case involves certain CBA's executed between the Union and Keim Concrete.

Generally, the Union works with two types of employers in the context of a CBA.  When

a the Union represents a majority of the employees of a certain contractor, the contractor is

automatically required to sign onto a CBA with the Union when an agreement is reached.

Employers subject to automatic agreement are § 9(a) employers under the National Labor

Relations Act ("NLRA"), 29 U.S.C. §§ 151-169.  29 U.S.C. § 159(a).  Other contractors, for

whom the Union does not represent a majority of employees, may also execute a CBA with the

Union.  These employers, however, only accept a CBA at their choosing, and are not otherwise

obligated to sign.  Employers who are not subject to automatic agreement are § 8(f) employers

under the NLRA.  29 U.S.C. § 158(f).  At all times, Keim Concrete was a § 8(f) employer under

the NLRA.

## 1. The 2002 Documents

In 2002, Keim was interested in working on the construction of a large power plant in

Toledo, Ohio (the "Sammi Project").  In May 2002, Keim contacted representatives from the

Union to learn of any required prerequisites for Keim Concrete to become eligible to work on the

Sammi Project.  Participation in the Sammi Project required Keim Construction to enter into a

CBA.  Soon afterwards, Keim met with Joseph Lucas ("Lucas"), a Union representative.  Lucas

explained to Keim that entering into a CBA with the Union would require all Keim Construction

employees performing work covered by the CBA to become Union members.  Keim informed
Lucas that Keim was the only employee of Keim Concrete.  Keim Concrete alleges that there
was no representation from Lucas that entering into any agreements with the Union would be
applicable to projects other than the Sammi Project.

Lucas presented four different agreements to Keim for Keim's review and acceptance.
One such document was the Ohio Highway Heavy Agreement, an existing CBA between the
Labor Relations Division of the Ohio Contractor's Association and the Union (the "Ohio
Highway Agreement").  The Ohio Highway Agreement mandated that Keim Concrete employ
only Union members as operators of concrete pumps and other heavy equipment for certain
types of horizontal building work, including: highway construction; airport construction; heavy
construction; railroad construction; sewer, waterworks, and utility construction; industrial and
building site construction; power plant, amusement park, athletic stadium site construction; and
pollution control, sewage plant, waste plant, and water treatment facilities construction.  Under
the Ohio Highway Agreement Keim Concrete was to deduct a specific amount from the pay of
participating Union members and apply those funds to the payment of Union dues and fringe
benefits.  The Ohio Highway Agreement allowed the Funds to conduct periodic audits of Keim
Concrete's payroll records.  This agreement was to be effective as of May 1, 2001 and
continuing until April 30, 2004, and "thereafter from year-to-year until terminated at the option
of either party, after sixty (60) days notice in writing to the other party." (Doc. 32 Union Mot. for
Summ. Judg. Ex. 2 p. 49.)

Another document given to Keim was the AGC Acceptance of Agreement, an existing
CBA between the Associated General Contractors and the Union (the "AGC Agreement").

Pursuant to the AGC Agreement, Keim Concrete was to employ only Union members to operate concrete pumps for certain types of vertical building work, including: industrial and building site construction; power plant, amusement, and athletic stadium construction; sewage plant, waste plant, and water treatment facilities construction.  Under the AGC Agreement Keim Concrete was to deduct a specific amount from the pay of participating Union members and apply those funds to the payment of Union dues and fringe benefits.  The AGC Agreement allowed the Funds to conduct periodic audits of Keim Concrete's payroll records.  The agreement was to be effective "through April 30, 2004 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party."  (Doc. 32 Union Mot. for Summ. Judg. Ex. 3 p. 49.)

Eligibility of a party to enter into Ohio Residential and Light Commercial Agreement (the "Ohio Residential Agreement") and the Ohio Building and Light Commercial Agreement (the "Ohio Building Agreement") was conditioned upon prior execution of the Ohio Highway Agreement and the AGC Agreement.  Both the Ohio Residential Agreement and the Ohio Building Agreement applied to certain types of work projects and incorporated by reference provisions of the Ohio Highway Agreement and the AGC Agreement with the exception of terms that were modified by the Ohio Residential and Ohio Building Agreements.  The Ohio Residential Agreement and the Ohio Building Agreement were both set automatically to terminate on May 14, 2004.

The Funds and the Union take the position that the only distinction between the Ohio Highway Agreement, the AGC Agreement, the Ohio Residential Agreement, and the Ohio Building Agreement is the geographic scope of the CBAs.

-4-

On May 20, 2002, and on behalf of Keim Concrete, Keim executed the Ohio Highway Agreement, the AGC Agreement, the Ohio Residential Agreement and the Ohio Building Agreement (as executed, the "2002 Ohio Highway Agreement," the "2002 AGC Agreement," the "2002 Ohio Residential Agreement," the "2002 Ohio Building Agreement," and collectively, the "2002 CBAs").  (*See* Doc. 32 Union Mot. for Summ. Judg. Exs. 3-6.) Keim did not read the 2002 CBAS before signing the documents. Keim allegedly understood that the 2002 CBAs related only to the Sammi Project.  On May 23, 2002, after executing the 2002 CBAS, Keim registered as a member of the Union and submitted paperwork formally requesting that his dues be deducted from his weekly pay. (*See* Doc. 32 Union Mot. for Summ. Judg. Ex. H.).

Keim Concrete was awarded and later completed a contract for work on the Sammi Project.  Despite having executed the 2002 CBAs, Keim Concrete did not submit fringe benefit contributions to either the Funds or the Union when working on the Sammi Project.  Keim Concrete did not register any of its employees with the Union and it did not hire employees for work from within the Union.  In addition, neither the Funds nor the Union audited Keim Concrete's payroll records. Douglas Baker, employed by the Funds as an auditor, testified that the frequency of audits may vary according to an employer's status, which can be delinquent or not delinquent.  (Doc. 35 Keim Concrete Mot. for Summ Judg. Ex. I p. 7:15-22.)  Where an employer's status is not delinquent, audits usually take place every two years.  Id. at 8:16.

### 2. The 2004 Documents

In October 2004, Keim was again interested in obtaining contracts for work on large scale public construction projects.  Specifically, Keim Concrete wanted to work on the bridge deck for the Ohio Route 30 Highway project (the "Route 30 Project").  Keim again contacted the

Union and spoke with Union representative, Steve DiLoreto ("DiLoreto").[1]  Keim wanted to

execute an agreement with the Union recognizing Keim as an owner/operator contractor.

DiLoreto informed Keim that Keim Concrete did not qualify as an owner/operator business.

DiLoreto explained to Keim that entering into a CBA with the Union would require any and all

Keim Concrete employees performing work covered by the CBA to become members of the

Union.  Unlike the four 2002 CBAs executed on behalf of Keim Concrete to enable the company

to obtain contracts to work on the Sammi Project, in 2004 DiLoreto presented only the AGC

Agreement and the Ohio Building Agreement to Keim for execution.[2]  Keim Concrete alleges

that DiLoreto only provided Keim with a portion of the Ohio Building Agreement for his

signature and that DiLoreto did not give Keim the Declaration of Trust which is a part of the

Ohio Building Agreement.  Keim represented to DiLoreto that Keim Concrete would not make

any fringe contributions under any new agreements with the Union until Keim Concrete

commenced work on the Route 30 Project.  Other than Keim's representation of his desire to

work on the Route 30 Project, DiLoreto does not recall other portions of any conversation

between himself and Keim.

On October 18, 2004, and on behalf of Keim Concrete, Keim executed the AGC

Agreement and the Ohio Building Agreement (as executed the "2004 AGC Agreement," the

---

[1]DiLoreto was the Union's District 6 Representative and supervised four union business agents, including: Thomas James, William Larrick ("Larrick"), Lucas, and David Russell.

[2]Keim alleges that execution the 2004 version of the Ohio Highway Agreement on behalf of Keim Concrete would also enable the company to work on the Route 30 Project and that DiLoreto presented Keim with the broader 2004 AGC Agreement despite knowing that a more narrow CBA would have sufficed.

"2004 Ohio Building Agreement," and collectively, the "2004 CBAs").  (*See* Doc. 32 Union Mot. for Summ. Judg. Exs. 11-12.)

The status of the 2002 CBAs at the time of the execution of the 2004 CBAs is contested. Keim Concrete states that DiLoreto admitted in his opposition that Keim Concrete was not covered by either the AGC Agreement or the Ohio Building Agreement at the time of execution of the 2004 CBAs. (*See* Doc. 93 Union Mot. for Summ. Judg. Ex. 19 p. 92:22-93:8.).  Keim Concrete states that the 2002 CBAs expired on April 30, 2004.  The Union takes the position that, at the time Keim executed the 2004 CBAs, the 2002 CBAs were set to expire, but were still in effect.

After execution of the 2004 CBAs, Keim Concrete received the Union's assistance in bidding on several large scale public construction projects, including the Route 30 Project.  Keim Concrete expanded and grew to a company with ten employees.  In April 2005, when Keim Concrete began work on the Route 30 Project, Keim Concrete began paying fringe benefits for three employees.  During this time, Union agents questioned Keim Concrete employees on several job sites to inquire about their Union status.  In May 2005, Union business agents met with Keim and informed him that Keim Concrete was under a contractual obligation to employ Union members exclusively on any job where work covered by a CBA was being performed.

In July 2005, Keim Concrete hired Emerson Morris ("Morris"), a concrete pump operator and member of the Union.  Morris had previously been employed by Tri-State Concrete Pumping ("Tri-State Concrete"), a competitor of Keim Concrete.  Keim Concrete began paying fringe benefits for Morris.  In addition, Keim asked Morris about Tri-State Concrete's method of paying fringe benefit contributions.  During the time Morris was employed with Tri-State

Concrete, the company's operators had a meeting with Kenneth Triplett ("Triplett")[3] and Lucas regarding Tri-State's payment of fringe benefit contributions. At that meeting, Triplett informed Tri-State Concrete's operators that fringe benefit payments to the Union were required only for on-site pumping time and not for travel time or time spent in the shop. Morris provided to Keim a copy of the time sheets used by Tri-State Concrete, which divided employee hours among on-site time, travel time, and shop time. Tri-State Concrete's time sheets served as the template for Keim Concrete's time sheets and were used by Keim Concrete to determine the amount of fringe benefit contributions owed to the Union and the Funds.

On February 17, 2007, Keim Concrete received a letter from the Union about CBAs between the Union and employers. The letter read as follows:

> Dear Employer:
>
> The purpose of this letter is to officially notify you that the Ohio Highway Heavy and/or AGC of Ohio Building Agreement(s), between your company or association and the International Union of Operating Engineers, Local 18 expires April 30, 2007.
>
> This is to advise you of our desire to modify, amend and/or negotiate a new agreement.
>
> It is also our desire to open negotiations for a new agreement covering wages, hours and conditions of employment.
>
> In accordance with applicable federal law, the International Union of Operating Engineers, Local 18 has filed the applicable notices with the Federal Mediation and Conciliation Service.
>
> Please acknowledge receipt of this letter and advise.
>
> Sincerely,

---

[3]Triplett is currently serving as Union president. While he is president of the Union, Triplett is also a trustee for the Ohio Operating Engineers Health and Welfare Plan.

Kenneth M. Triplett
President

(Doc. 32 Union Mot. for Summ Judg. Ex. 20 p. 49.)  The Union membership authorized a strike

should a new AGC Agreement and a new Ohio Highway Agreement not be reached.[4]  A new

AGC Agreement was reached for the period of 2007 to 2010.


### 3. The 2008 Documents

Representatives from the Union contacted Keim Concrete, along with other § 8(f)

employers, to accept the new 2007 to 2010 AGC Agreement.  Keim Concrete did not accept the

new agreement and stopped paying fringe benefit contributions for Keim after April 30, 2007.

Keim informed DiLoreto that Keim Concrete would continue to pay fringe benefit contributions

for Morris, who was still a member fo the Union.

On March 14, 2008, Keim went to the Union office and accepted the new agreement.

DiLoreto did not give Keim the AGC Agreement, which was the CBA Keim had executed on

behalf of Keim Concrete in 2004.  Instead, DiLoreto gave Keim Concrete the Ohio Highway

Agreement.  Keim executed the Ohio Agreement (as executed, the "2008 Ohio Highway

Agreement").(*See* Doc. 32 Union Mot. for Summ. Judg. Ex. 13.)  After Keim executed the 2008

Ohio Highway Agreement, Morris' health insurance, which had lapsed, was reinstated without

any gaps.[5]

---

[4]Keim Concrete alleges that a strike is prohibited during the term of the AGC Building
Agreement.  Therefore, Keim Concrete asserts that the Union's admission that its membership
authorized a strike is tantamount to an admission that the 2004 CBAs were terminating.

[5]In early March 2008, Morris' daughter was admitted to the hospital.  Morris was later
informed by the Funds that his health insurance had lapsed because he did not have enough

On September 10, 2008, Union business agent Larrick filed the Union's first grievance against Keim Concrete, alleging that Keim Concrete sent a nonunion operator to operate a concrete pump in Sugarcreek, Ohio in violation of the AGC Building Agreement.  According to the Stipulations in the record in this case, Keim Concrete was not covered by the AGC Building Agreement and was not listed on the Union's current contractor list as being covered by the AGC Building Agreement.[6]  (*See* Doc. 35 Keim Concrete Mot. for Summ. Judg. Ex. 11 p. 3.) The Union did not pursue this grievance.

Also in September 2008, Keim was informed by Union representatives that the Funds would be auditing Keim Concrete's records.  On October 16, 2008, Baker reviewed only Morris' time records and reports to the Funds and prepared the first audit report.[7]  The first audit report showed Keim Concrete to be in compliance, with an exception of $5.00.

### B. Procedural History

On November 6,2008, after review of the results of the first audit report, the Funds initiated the current action in this Court.  The Funds's Complaint asked for several forms of

---

hours and was required to be in compliance and covered with the Ohio Operating Engineers Health and Welfare Plan.  Morris relayed his health insurance problems to Keim.  Keim was confused because he had continued to pay fringe benefits for Morris.  Keim was allegedly not aware that the Union and the Funds are two separate entities.  Therefore, Keim contacted DiLoreto who informed Keim that Morris was no longer covered by the Union's health insurance because Keim Concrete "was out of contract" with the Union. (Doc. 32 Union Mot. for Summ. Judg. Ex. 17 p. 76:1-2.)

[6]Keim Concrete takes the position that the Union chose not to pursue the grievance because Keim Concrete was not a party to the AGC Agreement.  If Keim Concrete was not a party to the AGC Agreement, the argument follows, that the 2004 AGC Agreement executed by Keim was no longer in effect.

[7]Keim Concrete allegedly did not make payroll records for any other employees available to the auditor, alleging that Morris was the company's only Union employee.

relief: (1) an order from this Court that Keim Concrete produce all records necessary to determine the hours worked by, and the wages paid to, Keim Concrete employees covered by the various CBAs during the period of April 1, 2005 to the present; (2) payment to the Funds of the amount determined due as a result of the audit, plus 18% interest; (3) an additional payment equal to the greater of either 18% interest on the unpaid contributions or 20% of the unpaid contributions; and (4) collection costs, attorneys' fees, and court costs.

On November 20, 2008, the Union filed a Motion to Intervene in this case. On January 15, 2009, the Court granted the Union's Motion to Intervene. Also on January 15, 2009, the Union filed an Intervenor Complaint asking for: (1) payment to the Union of any amount found owing pursuant to an audit for which dues have been deducted but not paid; and (2) attorneys' fees, court costs, interest, and punitive damages.

On January 26, 2009, having answered both the Complaint and Intervenor Complaint, Keim Concrete submitted its Counterclaim. The Counterclaim alleges several grounds on which Keim Concrete is entitled to relief, including: (1) a declaratory judgment the CBA[8] was void *ab initio* because of fraud in the execution or voidable by Keim because of fraud in the inducement; (2) indemnification or contribution by the Union; (2) fraudulent misrepresentation; (4) negligent misrepresentation; and (5) compensatory damages, punitive damages, attorneys' fees, and costs.

During discovery the Funds obtained certain of Keim Concrete's pay reports and conducted a second audit. On July 8, 2009, the Funds issued a second audit report, which

---

[8] The Counterclaim does not specify under which CBA Keim Concrete seeks a declaratory judgment.

concluded that Keim Concrete owed $469,016.14 in fringe benefit contributions for the period of April 2005 until January 2009.

In early October 2009, Keim Concrete provided to the Funds and the Union the results of an internal audit.  Keim Concrete's internal audit found that Keim Concrete potentially owed $175, 348.04 in fringe benefit contributions under the AGC Agreement for hours worked on-site between April 1, 2005 and April 30, 2007.  If on-site hours, travel time, and shop time were to be included Keim Concrete would potentially owe $312,589.75 in fringe benefit contributions for the same time period.[9]

Later during the discovery process, the Funds were given access to Keim Concrete's employee cards and job tickets.  Baker used these records to conduct a third audit, the results of which were included in a third audit report.  The third audit report concluded that Keim Concrete owed to the Funds $935,593.22 for the time period of April 2005 until August 2009.

All parties have moved for summary judgment.  The motions have now been fully briefed, orally argued, and are ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[9]Keim Concrete's internal audit also showed that the company made an overpayment of $10,279.94 in fringe benefit contributions for hours worked on-site for the period of March 14, 2008 until August 1, 2009.  If on-site hours, travel time, and shop time were to be included Keim Concrete potentially overpaid $10,075.66 in fringe benefit contributions for the same time period.

In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rely merely on allegations or denials in its own pleading."  Fed. R. Civ. P.56(e)(2); *see Celotex*, 477 U.S. at 324; *Search v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. LAW AND ANALYSIS

### A. Motion to Strike

The Funds have moved to strike Exhibit Q to Keim Concrete's Response in Opposition to the Funds' Motion for Summary Judgment.  Exhibit Q is the Declaration of Anastasia J. Wade ("Wade"), counsel for Keim Concrete.  The Funds argue that Exhibit Q does not satisfy the requirements of Rule 56 because Wade does not have personal knowledge of the facts and documents upon which her analysis contained in the exhibit was based.  The Funds also allege that the Wade declaration violates the Ohio Rules of Professional Conduct because Wade is potentially both an advocate for Keim Concrete and a likely witness. In support of this argument, the Funds rely on *Reed Elsevier, Inc. v. Thelaw.Net Corp.* 197 F.Supp.2d 1025, 1028-29 (S.D. Ohio 2002).  In *Reed Elsevier*, defendant's supported their motion for summary judgment with an affidavit of defense counsel describing the contents of a disputed conversation.  197 F.Supp.

-13-

2d at 1028-29.  There, because the other party to the conversation could not be located and likely would not have remembered the contents of the discussion, the court found that the jury could *only* hear about the disputed conversation from defense counsel.  *Id*. Rather than disqualifying the defense attorney, the court allowed the defense to withdrawal the affidavit.  *Id*.  The situation in this case is distinguishable because Wade is not the *only* person who would be able to offer testimony about placing the contents of Keim Concrete's internal audit, which she did not conduct, into Excel.  Another individual could perform the same function using Excel and be able to offer testimony.

According to Keim Concrete, the Funds was made aware of: (1) Keim Concrete's internal audit; and (2) Wade's actions to put the results of that internal audit into Excel, prior to the taking Keim's Rule 30(b)(6) deposition.  Keim Concrete further alleges that the Funds indicated testimony on the Excel data of Keim Concrete's internal audit would not be necessary. Keim Concrete argues that the Wade declaration is not to provide the internal audit of Keim Concrete's records, but to show the data as it has been placed in Excel.  Keim Concrete takes the position that the purpose of Wade's declaration is not fact testimony and was only intended to provide to this Court the Excel program calculations of Keim Concrete's internal audit.  Further, Keim Concrete argues that because the internal audit was authenticated by Keim during his Rule 30(b)(6) deposition, any alleged authentication by Wade is harmless.[10]

---

[10]To the extent this Court determines that the results of Keim Concrete's internal audit were not previously authenticated during Keim's Rule30(b)(6) deposition, Keim Concrete has submitted the Second Supplemental Declaration of Larry Keim to authenticate the internal audit. With regard to Keim's second supplemental declaration, the Funds argue that there is nothing to demonstrate that Keim has personal knowledge of the use of Excel to conduct calculations.

Federal Rule of Civil Procedure 56(e) provides that "a supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e); *see also Collazos-Cruz v. U.S.*, No. 96-5452, 1997 WL 377037, *2 (6th Cir. 1997) ("An affidavit that does not satisfy the requirements of Rule 56(e) is subject to a motion to strike.").[11] Generally, "evidence submitted in a motion for summary judgment must be admissible," and "[h]earsay evidence must be disregarded."  *Alpert v. U.S.*, 481 F.3d 404, 409 (6th Cir. 2007). The United States Supreme Court has held that a party opposing a motion for summary judgment does not need to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.").

---

[11]The Sixth Circuit has held in an unpublished case that motions to strike exhibits to dispositive motions brought pursuant to Fed. R. Civ. P. 12(f) are not proper because exhibits do not constitute a pleading within the meaning of Rule 12(f). Fox v. Michigan State Police Dept., 173 Fed. Appx. 372, 374 (6th Cir. Feb. 24, 2006) (holding that a pleading is limited to those documents specified in Fed. R. Civ. P. 7(a) "a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served.") In this case, however, the Funds also allege that the exhibits should be struck pursuant to Fed. R. Civ. P. 56(e). While the Sixth Circuit has never affirmatively discussed whether Rule 56(e) can provide a vehicle for a motion to strike, it "has affirmed the granting of a motion to strike made under that rule." Blackshear v. Interstate Brands Corp., No. 2010 WL 2045195, at *3 (S.D. Ohio May 21, 2010) (citing to Mohney v. USA Hockey, Inc., 5 F. App'x 450, 454 (6th Cir. 2001)); see also Upshaw v. Ford Motor Co., 576 F.3d 576, 593 (6th Cir. 2009) (noting that district courts should strike only inadmissible portions of affidavits). Without further guidance from the Sixth Circuit, this Court assumes that motions to strike pursuant to Rule 56(e) are permissible.

Rather, the party opposing summary judgment "must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue of material fact exists, and that trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal citations omitted).

The Sixth Circuit has held that it is improper for a district court to consider an attorney affidavit where the affidavit was not based on personal knowledge.  *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005).  In *Brainard*, the attorney for the defendant submitted an affidavit in support of his client's motion for summary judgment.  *Id*. at 666.  As Keim Concrete has argued here, defense counsel's affidavit purported to "merely [collect] various forms of previously authenticated evidence for the court's benefit" and was allegedly submitted "as a matter of convenience for the district court."  *Id*.  The Sixth Circuit concluded that any error by the district court in admitting defense counsel's affidavit was harmless because the materials attached to the affidavit had been properly authenticated during discovery.  *Id*. at 667.

Whether consideration of the Wade declaration would be harmless is not the appropriate analysis at the district court level.  Instead, the issue is whether the Wade declaration is based upon personal knowledge.  Personal knowledge is not limited only to those actions in which the affiant or declarant directly participated and it may be derived from reviewing the contents of files and records.  *See Ridenour v. Collins*, 692 F. Supp.2d 827, 846 (S.D. Ohio 2010) (citing *Washington Central R.R. Co. v. National Mediation Bd.*, 830 F.Supp. 1343, 1353 (E.D. Wash. 1993).  Further, "[p]ersonal knowledge can come from review of the contents of business records, and an affiant may testify to acts that she did not personally observe but which are

-16-

described in business records." AT&T Corp. v. Overdrive, Inc., No. 1:05-CV-1904 2006 WL 3392746 (N.D. Ohio 2006) (citing *Washington Central R.R. Co.*, 830 F.Supp. at 1352-53; *Federal Sav. & Loan Ins. Corp. v. Griffin*, 935 F.2d 691, 702 (5th Cir.1991), *cert. denied*, 502 U.S. 1092 (1992)).

In *Reed Elsevier*, defendant's supported their motion for summary judgment with an affidavit of defense counsel describing the contents of a disputed conversation.  197 F.Supp. 2d at 1028-29.  There, because the other party to the conversation could not be located and likely would not have remembered the contents of the discussion, the court found that the jury could *only* hear about the disputed conversation from defense counsel.  *Id*. Rather than disqualifying the defense attorney, the court allowed the defense to withdrawal the affidavit.  *Id*.

In this case, Wade had personal knowledge of her review of the numbers obtained from Keim Concrete's business records.  Wade also has personal knowledge of the manner in which she input the data into Excel.  Under Sixth Circuit case law she has met the requirement of personal knowledge under Rule 56(e).  While Wade is presumably not the only person who would be able to use Excel and submit calculations regarding the results of Keim Concrete's internal audit, Keim Concrete has here chosen to rely on her affidavit.   Wade can not serve a dual function as attorney and potential witness.  While another individual could perform the same function using Excel and be able to offer testimony, that person can not be Wade.  Accordingly, the Funds' Motion to Strike Exhibit Q is **GRANTED**.

### B. Motions for Summary Judgment

As noted, the Funds, the Union and Keim Concrete have all moved for summary judgment.  The Funds argue that : (1) they are entitled to the contributions owed to the Funds by

Keim Concrete under the CBA;[12] (2) the court should grant interest, liquidated damages, attorneys' fees and court costs; and (3) a permanent injunction, available under the Employee Retirement Insurance Security Act ("ERISA"), should be issued against Keim Concrete to prevent the company from violating the CBA and from transferring any assets until the monies owed in this case have been paid in full.  Specifically, the Funds seeks judgment against Keim Concrete for the following amount:

> 1. Delinquent fringe benefit contributions for the period of April 1, 2005 to August 1, 2009 in the amount of $847,695.56 under 29 U.S.C. § 1132(g)(2)(A);
> 2. Interest in the amount of $393,087.82 calculated to March 15, 2010, plus $418.04 per day thereafter as long as the judgment remains unpaid under 29 U.S.C. § 1132(g)(2)(B);
> 3. Statutory interest in the amount of $393,087.82 calculated to March 15, 2010, plus $418.04 per day thereafter as long as the judgment remains unpaid under 29 U.S.C. § 1132(g)(2)(C);
> 4. attorneys' [sic] fees and costs (29 U.S.C. § 1132(g)(2)(D)
> 5. Injunctive relief

(Doc. 39 Funds Mot. for Summ. Judg. p. 3.)

The Union has moved for summary judgment on Keim Concrete's counterclaims for: (1) fraud in the execution; (2) fraud in the inducement; and (3) negligent misrepresentation.  Further, the Union argues that it is entitled to $7,373.71 from Keim Concrete for unpaid Union dues.

Keim Concrete has moved for summary judgment and argues that: (1) the 2004 AGC Agreement and the 2008 Ohio Highway Agreement are void due to fraud in the execution; and (2) the 2004 AGC Building Agreement terminated on April 30, 2007.  In its response to the

---

[12]The Funds are not precise in their briefing.  It seems as though they would find it sufficient that Keim Concrete was subject to a CBA because under any agreement with the Union, Keim would have been required to make fringe benefit contributions.  As discussed in the facts section, however, Keim executed the 2004 AGC Agreement and the 2008 Ohio Highway Agreement, along with other agreements in 2002 and 2004.  There is not simply one CBA at issue.

-18-

Funds Motion for Summary Judgment, Keim Concrete has also argued that the Funds' claims are barred under the doctrines of estoppel and laches.

### 1. Fraud in the Execution

The Union argues that it is entitled to summary judgment on Keim Concrete's counterclaim for fraud in the execution because any ignorance of Keim Concrete to the contents of the CBAs was not excusable. Keim Concrete takes the position that all § 8(f) agreements that were executed by the company in 2004 and 2008 are void due to fraud in the execution and, therefore, Keim Concrete is entitled to summary judgment on its counterclaim.

A claim for fraud in the execution alleges that a party was led "to believe the nature of his act is something entirely different than it actually is." *Iron Workers' Local No. 25 Pension Fund v. Allied Fence and Security Sys.*, 933 F.Supp. 1250, 1257 (E.D. Mich. 1996) (internal citations omitted). A claim for fraud in the execution arises when a party signs onto an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms" *Id*. (quoting Uniform Commercial Code § 3-305(2)(c)).

To demonstrate excusable ignorance, the party asserting the defense bears the burden to demonstrate that it fulfilled its "basic responsibility...to review a document before signing it." *Electrical Workers Local 58 Pension Trust Fund v. Gary's Electric Serv. Co.*, 227 F.3d 646,657 (6th Cir. 2000) (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir. 1997). In *Gary's Elec. Serv. Co.*, the Sixth Circuit stated that "[f]raud will not lightly be inferred and in the absence of such gross mistakes as would necessarily imply bad faith or a failure to exercise an honest judgment, [an agreement] may not be set aside." 227 F.3d at 657 (citing *NLRB v. Volney Felt Mills, Inc.*, 210 F.2d 559, 560 (6th Cir. 1954)). Further, courts within this

-19-

circuit have expressly refused to hold that the "excusable ignorance standard is satisfied, at least for purposes of surviving [a] motion for summary judgment, solely by virtue of the alleged misrepresentations made by an official of [the Union] in his telephone conversation." *Allied Fence*, 922 F.Supp. at 1259. Rather, courts finding fraud in the execution have required additional affirmative action. *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 493 (3d Cir. 1994) (finding fraud in the execution where "the union allegedly substituted the body of the contract document after the execution of the signature page"); *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1503-05 (9th Cir. 1984) (finding fraud in the execution where the employer went to the union's district office and signed various forms at the places indicated by a union official, but where the union did not provide the employer with a copy of the union's master labor agreement).

### a. The 2004 AGC Agreement

Here, Keim Concrete alleges that the Union misrepresented or failed to disclose both the type of agreement Keim was signing and the fact that Keim Concrete would be required to make fringe benefit contributions under the agreement. These are the type of allegations that the court in Allied Fence to be related to "passive" actions and insufficient, as a matter of law, to move forward on a claim for fraud in the execution. *Allied Fence*, 922 F.Supp. at 1259. Keim Concrete, however, has also asserted something more: that he was not provided with a portion of the 2004 AGC Agreement, specifically the Declaration of Trust,[13] before signing the agreement.

---

[13]The Funds and the Union argue that the Declaration of Trust does not set forth the required fringe benefit contributions because that information is contained within the CBA itself and that they are not trying to enforce any rights pursuant to the trust document. The Declaration of Trust is not in the record in this case. Further, counsel for Keim Concrete contend that they have yet to obtain a copy of the document.

In addition, Keim Concrete states that DiLoreto provided to Keim the 2004 AGC Agreement rather than the 2004 Ohio Highway Agreement because the AGC Agreement is broader and covers more work. DiLoreto allegedly did not tell Keim that he was executing the 2004 AGC Agreement and not the 2004 Ohio Highway Agreement. The Union and the Funds state that Keim's alleged failure to review the CBAs before signing them requires a finding that Keim Concrete cannot show excusable ignorance as a matter of law. But the alleged failure of the Union to provide Keim with the entire agreement, or with the agreement that Keim had requested and believed he was signing, moves the Union's actions from a passive nature into the active sphere. In *Allied Fence*, though the employer was provided with certain misinformation by the union, he remained able to review the entire agreement. *Id*. Here, regardless of what Keim was told by Union representatives, he alleges he was unable to review the whole agreement. Thus, Keim Concrete's counterclaim against the Union and affirmative defense against the claims of the Funds does not fail as a matter of law. Whether Keim received the entire AGC Agreement, including the declaration of trust, prior to executing the document in 2004 is disputed – a genuine issue of material fact. Therefore summary judgment is inappropriate. The Union's and Keim Concrete's Motions for Summary Judgment on Keim Concrete's fraud in the execution claims as they relate to the 2004 CBAs are **DENIED**.

### b. The 2008 Ohio Highway Agreement

Similar to those arguments made in relation to the 2004 CBAs, Keim Concrete alleges that the Union misrepresented or failed to disclose both the type of agreement Keim was signing and that Keim believed he was simply re-signing the 2004 AGC Agreement. Keim did not read the 2008 Ohio Highway Agreement before executing the document. As was discussed above,

this is the type of passive actions that have been found to be insufficient as a matter of law in asserting a claim or defense for fraud in the execution.  As with the 2004 CBAs, Keim Concrete has alleged that DiLoreto told Keim that he needed to sign the 2008 Ohio Highway Agreement so that Morris would have health insurance through the Funds.  If the 2004 AGC Agreement contained an automatic renewal provision, which is the position taken by both the Union and the Funds, then Keim Concrete would have continued to bound by the 2004 AGC Agreement.  If Keim Concrete continued to be bound by the 2004 AGC Agreement and was still obligated to make fringe benefit contributions, then Keim was not out of contract with the Union and executing a new CBA was not required for Morris to have health care and Keim was led "to believe the nature of his act" in executing the 2008 Ohio Highway Agreement was "something entirely different than it actually is."  *Allied Fence*, 922 F.Supp. at 1257.  This takes the Union's actions out of the passive and into the more active sphere.   Therefore, Keim Concrete's claims for fraud in the execution do not fail as a matter of law.  Further, because material facts are disputed regarding what was said, if anything, by DiLoreto prior to Keim executing the 2008 Ohio Highway Agreement, summary judgment is not appropriate.  The Union's and Keim Concrete's Motions for Summary Judgment on Keim Concrete's fraud in the execution claims as they relate to the 2008 Ohio Highway Agreement are **DENIED**.

### 2. Fraud in the Inducement

The Union argues that it is entitled to summary judgment on Keim Concrete's counterclaim for fraud in the inducement because the Union did not make any false statements of material fact about the nature and coverage of any of the CBAs.  Further, the Union contends that the is no evidence to support Keim Concrete's assertion that it justifiably relied upon any

representations allegedly made by the Union.  Keim Concrete avers that there are various disputed issues of fact as to whether any of the CBAs executed by Keim Concrete are voidable for fraud in the inducement.

ERISA allows "multiemployer plans to rely on the literal terms of written commitments between the plan, the union and the employer and, as a result, the actual intent or understanding of the contracting parties is immaterial when the meaning of the language is clear." *Trustees of B.A.C. Local 32 Insurance Fund v. Ohio Ceiling and Partition Co., Inc.*, 48 Fed. App'x. 188, 192 (6th Cir. 2002); *see also* 29 U.S.C. § 1145.   The Sixth Circuit has opined that traditional contract defenses "such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law" are not available to employers in this context. *Id*. at 192 n. 2 (citing *Cent. States, S.E. and S.W. Areas Pension Funds v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989) (en banc)).   The Sixth Circuit, however, has allowed counterclaims for fraudulent inducement where those counterclaims are brought against a union and not against employee benefit funds or other pension plans.  *See Northwestern Ohio Adm'rs, Inc. V. Walcher & Fox, Inc.*, 270 F.3d 1018, 1031 (6th Cir. 2001) (allowing a claim for fraud in the inducement where the employer alleged the union expressed that the union wanted to show the employer "the benefits of having a union labor force, when in fact it was deceiving the employer into paying union benefits for all its employees").

A claim for fraud in the inducement alleges that a party was induced "to assent to something he otherwise would not have."  *Allied Fence*, 933 F.Supp. at 1257 (internal citations omitted).  Under Ohio law, "in order to prove fraud in the inducement, a plaintiff must prove that

the defendant made a knowing, material misrepresentation with the intent of inducing the

plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment."

*ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502 (Ohio 1998) (citing *Beer v. Griffith*, 61 Ohio

St.2d 119, 123 (Ohio 1980)). Courts have found fraud in the inducement despite any express

language that contradicted any representations made by union officials. *See Sw. Adm'rs, Inc. v.

Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986) (finding fraudulent inducement where the

employer understood that, despite the language of the document he signed, he would not be

required to make retroactive contributions); *Southern Cal. Retail Clerks Union and Food

Employers Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1265-66 (9th Cir. 2004)

(finding fraudulent inducement where the employer was falsely assured that he would only be

required to make contributions for his full-time employees).

Here, Keim Concrete has alleged that the Union induced him to execute the 2002 CBAs,

the 2004 CBAs, and the 2008 Ohio Highway Agreement. Keim Concrete alleges that the Union

misrepresented the documents he was signing by having him sign all of the 2002 CBAs when he

only wanted to work on the Sammi Project and the 2004 CBAs when he only wanted to work on

the Route 30 Project. According to Keim Concrete, more limited agreements with the Union

were available. Further, Keim alleges that he was not told that Keim Concrete would have to

make fringe benefit contributions for all of its employees. In addition, Keim asserts he was led

to believe fringe benefit contributions were not required because he was never required to make

any payments to the Union or the Funds under the 2002 CBAs and he was also never audited or

told that he was not otherwise in compliance. With regard to the 2008 Highway Agreement,

Keim alleges that DiLoreto misrepresented that execution of the agreement was necessary to

secure health insurance for Morris.  Rather, Keim contends that Morris' health insurance was governed by the Funds. Each of these facts is contested by the parties and each is material to a determination as to whether Keim Concrete was fraudulently induced to execute agreements with the Union.  Since there are material facts in dispute, summary judgment on Keim Concrete's fraud in the inducement claim is inappropriate and the Union's motion for summary judgment on this count is **DENIED**.

### 3. Negligent Misrepresentation

The Union has moved for summary judgment on Keim Concrete's counterclaim for negligent misrepresentation, arguing that this claim fails as a matter of law.  Keim Concrete counters that there are material facts in dispute as to this counterclaim.

A party "is liable for negligent misrepresentation if he: (1) supplies false information; (2) for the guidance of others in their business transactions; (3) causing pecuniary loss to the plaintiff (4) while the plaintiff justifiably relied upon the information (5) and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information."  *Doe v. SexSearch.com*, 551 F.3d 412, 418 (6th Cir. 2008).  Liability on a claim for negligent misrepresentation also requires a "special relationship under which [the party] supplied information...for guidance in [a] business transaction."  *Ziegler v. Findlay Indus., Inc.*, 464 F.Supp.2d 733, 738 (N.D. Ohio 2006); *see also Hayes v. Computer Assoc. Inc.*, No. 03:02 CV 7452, 2003 WL 21478930, at *6 (N.D.Ohio June 24, 2003) (unreported). ("This relationship occurs only in 'special' circumstances. Usually the defendant is a professional (e.g., an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class. This 'special' relationship does not

exist in ordinary business transactions."). The Sixth Circuit has held that "[u]nlike a fraud claim, however, a negligent misrepresentation claim only lies for an affirmative false statement, not an omission. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 506 (6th Cir. 2003).

Keim Concrete has not alleged that it had a "special relationship" with the Union necessary for its negligent misrepresentation counterclaim. Therefore, Keim Concrete's counterclaim fails as a matter of law and the Union's Motion for Summary Judgment on the negligent misrepresentation counterclaim is **GRANTED**.

### 4. Termination of the 2004 AGC Agreement

Keim Concrete argues that it is entitled to a judgment that the 2004 AGC Agreement terminated as of April 30, 2007. The Funds and the Union both contend that the AGC Agreement did not expire, was never terminated, and contains a self-renewal clause.

The Sixth Circuit has found that termination of contract allegations, like those argued by Keim Concrete here, are not precluded contract defenses under ERISA and may be asserted against both employee benefit funds and labor unions. *See Plumbers & Pipefitters Local Union No. 572 Health and Welfare Fund, et al. v. A&H Mechanical Contractors, Inc.*, 100 Fed. App'x. 396, 403 (6th Cir. 2004) ("Instead of a precluded contract 'defense,' A-H's termination argument goes to the question whether a contractual promise to contribute exists in the first instance"); *see also DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994) (stating that employee benefit funds "are not entitled to enforce a nonexistent contractual obligation").

Employers who have relationships with a labor union pursuant to § 8(f) of the NLRA, 29 U.S.C. § 158(f) are not obligated to bargain for successor contract. *See James Luterbach Constr. Co.*, 315 N.L.R.B. 976, 979 (1994). Further "[s]ection 8(f) differs because it allows employers

engaged primarily in the building and construction industry to enter into pre-hire agreements which contain union security clauses whether or not the union represents a majority of the employer's employees." *Id*. at 978; *Deklewa v. NLRB*, 843 F.2d 770, 772-73 (3d Cir. 1988) (explaining that a pre-hire agreement is "a contract agreed to by an employer and a union before the workers to be covered by the contract have been hired"). "Either party in an § 8(f) relationship is free to unilaterally withdraw and avoid any obligation to bargain for a successor contract upon the expiration of the collective bargaining agreement." *Sheet Metal Workers' Inter. Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231 (3d Cir. 1999) (internal citations omitted); *see also Gottfried v. Sheet Metal Workers' Intern. Ass'n, Local Union No. 80*, 876 F.2d 1245, 1249 (6th Cir. 1989).

Courts have previously held that there was no genuine issue of material fact that a CBA terminated, where notice of the termination was provided to the employer in a letter from the labor union. *See Iron Workers Tri-State Welfare Plant v. Carter Const.*, Inc., 530 F. Supp.2d 1021, 1029 (N.D. Ill. 2008). In Iron Workers Tri-State, the union sent a letter stating: "as an association and on behalf of each individual member for which it holds bargaining rights, hereby terminates the current Collective Bargaining Agreement with Iron Workers Local Union 380 for the contract expiring April 2004." *Id*. There, the court found that the letter terminated the collective bargaining agreement. *Id*. ("There is no real dispute that the 2001 Agreement was terminated.").

Where the CBA contains an automatic renewal provision, or evergreen clause, however, courts have upheld the validity of those clauses and found the employer to be bound to under the agreement. *Cedar Valley Corp. v. NLRB*, 977 F.2d 1211, 1219 (8th Cir. 1992). In *Cedar Valley*,

the relevant contract contained a provision stating "[t]his contract shall be in effect from May 1, 1978 to April 30, 1981 and shall automatically renew itself thereafter from year to year unless either party hereto gives the other party no less than sixty (60) days notice by registered mail prior to the expiration date expressing their desire to modify, amend or terminate this contract."[14] *Id*. There, when the employer alleged that the contract with the union had terminated, the court found that "[b]arring satisfactory formal termination, Cedar Valley would remain obligated to either additional agreements or the automatically renewed 1978 prehire agreement." *Id*. The Sixth Circuit has embraced the reasoning of the *Cedar Valley* Court, and has stated that "an automatic renewal clause between the parties to an § 8(f) agreement will be given effect and operates to bind the parties to a continuation of the agreement." *Gary's Electric*, 227 F.3d at 653 (citing *NLRB v. Ross Bros. Construction Co.*, No. 95-5135, 1997 WL 215513, at *2 (6th Cir. Apr.29, 1997) (unpublished per curiam )); *see also Ohio and Vincinity Regional Council of Carpenters v. Greg Constr. Co.*, 433 F.Supp. 2d 862, 864 (N.D. Ohio 2006) (denying summary judgment to all parties where an employer failed to attend the arbitration proceedings under the mistaken belief that the collective bargaining agreement with a labor union had expired despite the presence of an "evergreen provision" within the agreement). In *Greg Constr. Co.*, the court found that there was a genuine issue of material fact as to whether the labor union should have known of the employer-defendant's behavior in employing non-union carpenters and, therefore, of his apparent repudiation of the collective bargaining agreement. *Id*. at 866. That the employer-defendant "paid CBA wages, contributed to the Unions' benefit funds, filed CBA

---

[14] This is essentially the same as the automatic renewal clause found within the 2004 CBAs executed by Keim on behalf of Keim Concrete.

mandated payroll reports, and requested employees from the Unions under CBA prescribed guidelines on a number of projects in Northwest Ohio between 1997 and 2003," after the alleged expiration of the agreement in 1997 was not conclusive. *Id*.

In this case, Keim Construction claims that the Union's letter of February 17, 2007 gave notice that the Union intended to let the 2004 AGC Agreement expire. (*See supra* for the text the February 17, 2007 letter.) The Union claims that because the 2004 AGC Agreement contained an automatic renewal provision, the CBA did not terminate, and that Keim Concrete remained bound to the agreement until it provided notice of it's intent to terminate the agreement. As a matter of law, the automatic renewal provision of the 2004 AGC Agreement is valid. The automatic renewal provision is not dispositive as to whether the CBA terminated because a party may terminate an agreement by conduct. *See Greg Constr. Co.*, 433 F.Supp. 2d at 866.

This Union's position with regards to the automatic renewal provision is inconsistent with two later actions by the Union: (1) DiLoreto's statement to Keim prior to Keim executing the 2008 Ohio Highway Agreement that Morris lacked health benefits because Keim Concrete was not under contract with the union; and (2) the fact that Union records do not show that Keim Concrete was an contractor under the AGC Agreement and that Keim Concrete was only a contractor under the Ohio Highway Agreement. These facts would indicate a belief on behalf of the Union that Keim Concrete was no longer a party to the 2004 AGC Agreement. Further, Keim Concrete's actions in failing to comply with its obligations under the 2004 AGC Agreement after the alleged April 30, 2007 termination date are not consistent with a party that believed itself to be bound to a continuing agreement. The issue then becomes whether the

Union knew or should have known of Keim Concrete's actions that repudiated the 2004 AGC Agreement. Because material facts are disputed as to any actions taken by DiLoreto with regard to telling Keim that he was out of contract with the Union, summary judgment is not appropriate. Keim Concrete's is not entitled to summary judgment on its claim for a declaratory judgment that the 2004 AGC Agreement terminated on April 30, 2007. Therefore, Keim Concrete's claim for summary judgment on the issue of the termination of the 2004 AGC Agreement is **DENIED**.

### 5. Funds Due Under the 2004 and 2008 CBAs

In its Motion for Summary Judgment, the Funds argue that Keim Concrete owes fringe benefit contributions pursuant to the various CBAs for all hours paid to Keim Concrete employees and regardless of whether a particular employee is a member of the Union. Keim Concrete takes the position that the Funds claims are barred by the doctrines of estoppel and laches because Keim reasonably relied on misrepresentations of Triplett, a trustee for the Funds, and because the Funds unreasonably delayed in seeking fringe benefit contributions.

ERISA provides: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The Sixth Circuit has elaborated that "[t]his language was added to ERISA 'to simplify delinquency collection' by freeing pension and welfare funds from defenses that pertain to the unions' conduct." *Laborers' Pension Trust Fund-Detroit and Vicinity v. Rockwall Co.*, 357 Fed. App'x. 638, 640 (6th Cir. 2009) (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 460 (6th Cir.1989)). Similarly, the Ninth Circuit has stated that "[i]n recognition

of the fact that millions of workers depend upon employee benefit trust collection funds for their retirement security, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability of contract defenses, which make collection actions unnecessarily cumbersome and costly."  *Sw. Adm'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir. 1986).

Under the law of this Circuit, "multi-employer trust funds are entitled to rely on an employer's promises to make contributions to the funds, *irrespective of any breach or omission by the union*."  *Laborers' Pension Trust Fund-Detroit and Vicinity*, 357 Fed. App'x. At 640 (emphasis added).   Therefore, the traditional common law defenses of estoppel and laches asserted by Keim Concrete are not available as a matter of law.

The Sixth Circuit has also held that "[a]s a matter of law, collective bargaining agreements may require employers to contribute funds for all employees, not just employees who are members of the union." *Trustees of the B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.*, 163 F.3d 965, 969 (6th Cir.1998).  The Funds argue that the applicable CBA[15] expressly requires fringe benefit contributions for all employees and for all hours paid.  The 2008 Ohio Highway Agreement states:

> Fringe benefit contributions shall be paid at the following rates for all hours paid
> to each employee by the Employer under this Agreement which shall in no way
> be considered or used in the determination of overtime pay.  Hours paid shall
> include holidays and reporting hours which are paid.

---

[15]The Funds argue that the applicable CBA is the 2004 AGC Agreement.  As discussed below, however, the issue of whether the 2004 CBAs were void due to fraud in the execution, or had been terminated remain.  Therefore, the Court will look to the contents of the 2008 Ohio Highway Agreement, about which there are no outstanding counterclaims or defenses alleged by Keim Concrete.

(Doc. 35 Keim Concrete Mot. for Summ. Judg. Ex. 8 p. 19 ¶ 35.)  The same provision is found within the 2004 AGC Agreement.  (Doc. 35 Keim Concrete Mot. for Summ. Judg. Ex. 7 p. 18 ¶ 43.)  The language of the CBAs is clear that fringe benefit contributions are to be made for all employees performing work covered by the CBA for all hours paid.

As detailed *supra*, the parties have each conducted audits of Keim Concrete's financial records and have come up with different figures as to the amounts potentially owed to the Funds and to the Union.  These varying figures do not bear on the question of Keim Concrete's liability to make fringe benefit contributions.  Since Keim Concrete's counterclaim and affirmative defense of fraud in the execution remains, however, liability has not been determined for fringe benefit contributions under the 2004 CBAs and the 2008 Ohio Highway Agreement during the audit period.   Accordingly, the Union's claim for Summary Judgment for outstanding dues is **DENIED**.

### 6. Injunctive Relief

The Funds seek a court order: (1) requiring Keim Concrete to report to the Funds all hours worked by employees operating concrete pump trucks from August 1, 2009 (the end of the audit period in this case) through the present and; (2) requiring Keim Concrete to pay fringe benefit contributions and interest and liquidated damages to the Funds based on these hours.  The Funds argue that they are entitled to a permanent injunction against Keim Concrete obligating the employer to comply with the CBA because Keim Concrete's conduct demonstrates that the company will continue to withhold fringe benefit contributions.  According to the Funds, Keim Concrete continues to employ concrete pump operators for whom no contributions are being

paid. The Funds also assert that continued violations of the CBAs will cause them irreparable harm.

ERISA allows the Funds to seek injunctive relief in this context, but Congress did not set forth the standard to be applied in determining whether injunctive relief is appropriate. *See* 29 U.S.C. § 1132. Therefore, this Court will apply the usual standard for the Funds' requested permanent injunction. A party seeking a permanent injunction must establish each of the following four elements: "(1) actual success on the merits; (2) a substantial threat that it will suffer irreparable injury without the relief requested; (3) that the threatened injury outweighs any damage that the injunction may cause to others; and (4) that the injunction will serve the public interest." *Citizens for Community Values, Inc. V. Upper Arlington Public Library Bd. of Trustees*, No. 2008 WL 3843579, 16 (S.D. Ohio 2008); *Amoco Prod. Co. V. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987) ( stating that the standards for granting a permanent injunction "essentially the same," as that for a preliminary injunction, except that a plaintiff must demonstrate actual success on the merits rather than a mere likelihood of success); *see also Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (outlining the standard for a preliminary injunction).

Courts considering the issue of injunctive relief have come to various conclusions in this context. *See Laborers' Pension Trust Fund-Detroit and Vicinity v. Rockwall Co.*, 357 Fed. App'x. 638, 640 (6th Cir. 2009) (issuing a permanent injunction on appeal after finding the legal remedy to be inadequate where the defendant "ignored the Fund's discovery demand" and "refused to appear at any of the proceedings...until a bench warrant was issued for his arrest"); *Operating Engineers Central Pension Fund v. Joski Const. Co., Inc.*, 441 F.Supp. 849, 850

(refusing to issue a preliminary injunction because plaintiffs did not allege that they lacked an adequate remedy at law or that they would suffer irreparable harm)

Here, the Funds have not succeeded on their claim for delinquent fringe benefit contributions.  Like the plaintiffs in *Joski Const.*, the Funds have not adduced evidence that they lack an adequate remedy at law or that they would suffer irreparable harm.  Mere allegations to comply with the various prongs of the injunctive relief analysis do not suffice.  Therefore injunctive relief is **DENIED**.

### V. CONCLUSION

For the foregoing reasons, the Funds' Motion for Summary Judgment (Doc. 39) is **DENIED**; the Union's Motion for Summary Judgment (Doc. 32) is **GRANTED in part**; Keim Concrete's Motion for Summary Judgment (Doc. 35) is **DENIED**; and the Funds' Motion to Strike (Doc. 43) is **GRANTED**.

**IT IS SO ORDERED.**

__s/Algenon L. Marbley__
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: August 30, 2010**